(C. D. 920)

FIBRE MAKING PROCESSES, INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided May 2, 1945)

*Siegel & Mandell* (*Joshua. M. Davidson* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon* and *Arthur R. Martoccia,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges; KINCHELOE, J., concurring; LAWRENCE, J., dissenting

TILSON, Judge: This suit against the United States involves the proper classification of imported merchandise described as "one spiral heat exchanger," which was classified under paragraph 397 of the Tariff Act of 1930, as "Articles or wares not specially provided for * * * composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, * * *" and duty was levied thereon at the rate of 45 per centum ad valorem.

The plaintiff claims said merchandise to be properly dutiable at only 20 per centum ad valorem under paragraph 372 of said act, as amended by the trade agreement with Sweden, T. D. 47785, as "Machines for making paper pulp or paper, not specially provided for, and parts thereof, not specially provided for, wholly or in chief value of metal or porcelain."

At the trial of the case counsel for the plaintiff stated:

* * *. That is my only claim, as a matter of fact. The claim is for machines for making paper pulp or paper not specially provided for and parts thereof.

The record in the case of *American Heat Reclaiming Corp.* v. *United States,* 8 Cust. Ct. 214, C. D. 608, was incorporated as a part of the record herein, counsel for the plaintiff explaining that the reason for incorporating the record in the above case was "for the purpose of describing the operation of the spiral heat exchanger."

In addition to the record in the previous case, counsel for the plaintiff offered the testimony of one witness, who was also the only witness to testify in the previous case. The following is quoted from his testimony in the instant case:

* * *. This particular heat exchanger was installed in connection with the digester, which is a part of the pulp machine. Now, when a pulp is made, cellulose pulp is made mostly from wood. The wood is chipped in small pieces and boiled in a certain acid, depending on what kind of pulp we are making. If we make a bleaching pulp we have one kind of acid, if we have a craft pulp we have another kind. Anyhow, it is poured under rather high pressure and high temperature. When the pulp is ready, boiled, we have to decrease the pressure in the digester.

*     *     *     *     *     *     *

In doing so we cannot let those gasses out in the atmosphere, due to the odor, it would be impossible to be anywhere close to it. And besides that would be a loss of heat. This heat exchanger is installed in a relief line, that is, a connection to the digester, where we open the valve and start to decrease the pressure in the digester before we open the top and let out the pulp. Now, the gasses and steam from the high pressure digester pass through this heat exchanger, where the heat from the gasses and steam is absorbed in either water, which is used in the process, or through cooking liquor which is later on put direct into the digester. .

When this relief valve, or line, has been opened long enough so that the pressure inside the digester, or cookers, come close to the outside pressure we open it up and dump out the pulp from the digester and start a new process, a new cycle. That is the application for this type of heat exchanger. Besides that, there are any number of other applications which I do not think you want here.

*    *    *    *    *    *    *

This particular merchandise imported is used exclusively in pulp. But similar exchangers are also used in other industries where heat can be—

Judge KINCHELOE. I am talking about this one. I am not interested in the other.

The WITNESS. This is used exclusively in pulp making machines.

Explaining that the liquor used in the production of pulp solidifies, forming a calcium bisulphate, and also that there remained free $SO_2$, the witness then stated:

Now, that means we have a free and we have a combined $SO_2$. The $SO_2$ we have depends on the temperature and the pressure under which the pulp is boiled. If we have a high temperature the free $SO_2$ is thrown off, if the pressure isn't high enough. Now that means that the $SO_2$ since the process has served as a catalyzer—the processes are not destroyed but it is still there, it can be recovered and used in the next cycle, you see?

Q. That is by means of the heat exchanger?—A. By means of heat exchangers.

Q. Let me ask you this question: can you practically, or practicably, make paper pulp without the use of this heat exchanger, or is it an essential, integral part of pulp making machines?—A. You can't.

Q. You cannot?—A. You cannot make pulp without the use of heat exchangers.

Q. You say it is an essential, integral part?—A. Yes.

Q. Do you know whether or not this importation was imported expressly and designed for use in a pulp making machine?—A. It was.

On cross-examination the witness testified that these spiral heat exchangers have been applied in almost all chemical industries, principally, however, in the pulp industry and sugar industry, and by some in the sulphuric-acid industry. Referring to his testimony in the previous case, the witness admitted he had testified therein that these spiral heat exchangers "* * * have been used in connection with pulp making in a pulp plant. I would not say in connection with pulp making machinery, but in a pulp plant. * * *. I do not remember it word for word, but it is true anyhow * * *." The witness admitted that these spiral heat exchangers can be used interchangeably in the different industries.

Judge KINCHELOE. I asked you awhile ago directly whether this specific

importation that is now before the court—and I am not talking about anything else—is one that you are familiar with and of which you know the function?

The WITNESS. Yes.

Judge KINCHELOE. Is it used exclusively in the pulp manufacturing industry, looking to the manufacturing of paper?

The WITNESS. That particular imported machine is used exclusively in pulp making—for pulp making.

It was conceded at the trial that this machine is in chief value of metal.

It is observed that neither the Tariff Act of 1930 nor any of the trade agreements contain any provision for *machinery* for making paper pulp or paper, and parts thereof, nor does the Tariff Act of 1930 contain any provision for *machines* for making paper pulp or paper, or parts thereof. This being true, it is clear that there is no conflict in the testimony of the witness when he stated that he would not say that the instant spiral heat exchanger was used in connection with pulp-making *machinery*, and his testimony that you cannot make paper pulp without the use of this heat exchanger, and that it was an essential, integral part of a pulp-making machine. Neither does there appear to be any serious conflict in the testimony of the witness to the effect that this spiral heat exchanger is used exclusively in pulp-making machines, and his testimony that similar articles are used in connection with pulp making in a pulp plant, since it appears inconceivable that a pulp plant would not contain at least one machine for making paper pulp.

In our opinion, the evidence in this case brings the spiral heat exchanger squarely within the rule of a "part" as that word was defined in *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. 322, as follows:

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*. *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249; *United States* v. *American Steel & Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T. D. 41673; *Peter J. Schweitzer, Inc.* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, and cases cited therein; *United States* v. *John Wanamaker*, 16 Ct. Cust. Appls. 548, T. D. 43266.

The appellate court also stated that:

The mere fact that two articles are designed and constructed to be used together, does not necessarily make either a part of the other. *Columbia Shipping Co. et al.* v. *United States*, 11 Ct. Cust. Appls. 281, T. D. 39085; *United States* v. *Kalter Mercantile Co. et al.*, 11 Ct. Cust. Appls. 540, T. D. 39680.

In his concurring opinion in the *Willoughby* case, Judge Bland agrees with the majority as to what constitutes a "part" in the following language:

An accessory to an article might be chiefly used with the article and yet not be part of it, because to be part of it, under the decisions cited in the majority opinion,

it must be such an integral part of the same that the article itself would not function *as such article* without the accessory or part.

In his specially concurring opinion in the *Willoughby* case, Judge Lenroot observed:

I concur in the statement in the majority opinion that in order to be a part of an article, such part must be an integral, constituent, or component part, without which the article to which it is to be joined could not function as such article.

In our opinion this record definitely establishes that the machine for making pulp to which the imported spiral heat exchanger is to be joined could not function as a pulp-making machine without the joining thereto of the spiral heat exchanger. The uncontradicted testimony of the only witness who testified in this case is that you cannot make pulp without the use of these heat exchangers, and that they are essential, integral parts of pulp-making machines.

Our appellate court in the *Willoughby* case also observed:

The court below held that the involved tripods were chiefly used as parts of cameras, and, therefore, dutiable as such parts. Of course, if they are parts of cameras and chiefly so used, the judgment must be affirmed. *Magone* v. *Wiederer*, 159 U. S. 555. However, if they are not parts of cameras, the fact that they are chiefly used in connection with, and as supports for, cameras, is, obviously, not of vital importance in a proper determination of the issues before us.

Of course, if the tripods were integral, constituent, or component parts of cameras, without which the cameras to which they were to be joined, could not function as such cameras, then such tripods would be parts of such cameras, under the above-quoted language, apparently without regard to the use or chief use of such tripods. Likewise, if the tripods were not parts of cameras, within the rule laid down therefor, the fact that they are chiefly used in connection with, and as supports for, cameras, would be immaterial in determining whether or not such tripods are parts of cameras. Thus, in order to determine whether a given article is a part of another article, we must return to the original rule laid down by the appellate court in the *Willoughby* case, that it must be "* * * an integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article." And this is without any regard to the chief use of such "part." In other words, the last quotation from the *Willoughby* case reads out of the equation any question as to the use or chief use of the article which is claimed to be a part of another article. This must necessarily be true, because the rule for determining whether or not a given article is a part of another article is without qualification, and contains no mention of use or chief use.

Therefore, the fact that this spiral heat exchanger is used in many industries and can be interchangeably used in the different industries, and also the fact that it is not shown that it is chiefly used in connection with machines for making paper pulp, is not here material. However, the fact still remains that machines for making paper pulp

could not function as machines for making paper pulp without this spiral heat exchanger, and this appears to completely satisfy the definition of a "part," as laid down by the appellate court in the *Willoughby* case. It is an integral, constitutent, or component part, without which the article to which it is to be joined, could not function as such article.

It is true this record contains no testimony as to the exact location of this spiral heat exchanger with reference to the machine for making paper pulp, or as to how the spiral heat exchanger is connected with the machine for making paper pulp, but in our opinion the plaintiff established a *prima facie* case without such testimony, and the eliciting of testimony with regard to these matters was a proper subject for cross-examination.

The function of a dynamo is to generate electricity. This electricity may be used to light electric-light bulbs, to drive electric motors, to propel electric trains, to heat electric stoves, and for many other purposes, and all of these articles might be said to be used in connection with the dynamo. And yet no one would contend that an electric-light bulb, an electric motor, an electric train, or an electric stove were parts of the dynamo. The reason for this is obvious. The proper functioning of the dynamo is in no sense dependent upon the presence or absence of any of the above-named articles which utilize the electricity generated by the dynamo. However, if before the dynamo would generate electricity it had to have joined thereto a light bulb, a motor, a train, or a stove, then under the definition of "parts" in the *Willoughby* case, these latter articles would have to be held to be "parts" of the dynamo, because the dynamo, in the absence of such articles, could not function as such article—a dynamo.

In our consideration of this case we have not overlooked the illustrations by the appellate court in the *Willoughby* case of typewriter desks designed to be used with typewriters, a piano bench or stool and a piano, and the stationary engine and its base, and the observation of the court hereinbefore quoted that "The mere fact that two articles are designed and constructed to be used together, does not necessarily make either a part of the other." These illustrations support our conclusion in the instant case, because a typewriter would still function as a typewriter whether or not joined to a typewriter desk, and a piano is capable of producing the same results whether the player sits upon a stool, bench, chair, or some other object; whereas, in the instant case the testimony is to the effect that the machine for making paper pulp would not and could not operate at all without having joined thereto the spiral heat exchanger here involved.

For all of the reasons heretofore stated and following the decision of our appellate court in the *Willoughby* case, *supra*, and *Decorated Metal Mfg. Co. v. United States*, 12 Ct. Cust. Appls. 140, we hold the spiral

heat exchanger involved in this suit to be properly dutiable at only 20 per centum ad valorem under paragraph 372 of the Tariff Act of 1930, and the trade agreement with Sweden, T. D. 47785, as alleged by the plaintiff.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.

### CONCURRING OPINION

KINCHELOE, Judge: I concur in the conclusion reached herein; but I do not approve of some of the language used in the opinion.

### DISSENTING OPINION

LAWRENCE, Judge: The opinion originally prepared by me was intended to express the views of the majority. However, for reasons which will presently appear, I am now constrained to write a dissent.

I respectfully disagree with my associates in their conclusion that the spiral heat exchanger in controversy is a part of a machine for making paper pulp or paper, within the rule announced in *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851.

I am of the opinion that the record fails to establish that the imported device is an integral, constituent, or component part of a machine for making paper pulp or paper, and that it is chiefly so used, as required by said rule.

In their brief filed herein counsel for plaintiff insist that—

The uncontradicted testimony and evidence establishes conclusively that the imported merchandise is an integral, constituent and component part of the pulp making machine without which the machine could not function as such.

I do not so read the record. An examination of the testimony of the only witness in the case discloses that it is not entirely accurate to say that he gave "uncontradicted testimony." For instance, answering an inquiry of the court concerning the imported device, the witness replied: "This is used exclusively in pulp making machines," notwithstanding he had previously testified in the incorporated case that similar devices were "used in connection with pulp making in a pulp plant," adding "I would not say in connection with pulp making machinery, but in a pulp plant."

In passing, it may be noted that, in the absence of proof of chief use, it would seem to be a matter of little consequence that the instant importation may have been "used exclusively in pulp making machines." But it is important to know the chief use of such or similar devices. The witness conceded that—

This spiral heat exchanger has been applied in almost all chemical industries, *principally, however, in the pulp industry and sugar industry*, and by some in the sulphuric acid industry." [Italics supplied.]

and that they can be interchangeably used in the different industries,.

His statement that "This heat exchanger is installed in a relief line, 'that is, a connection to the digester" creates uncertainty as to its exact relation to a pulp-making machine. Query: Is the digester complete in itself without the relief line, or does its completion require that it be joined to the relief line in which the spiral heat exchanger is installed?

The record does not disclose the length of the so-called relief line in which the imported spiral heat exchanger is installed, nor whether or not the line is part of the digester or of the spiral heat exchanger to each of which the line is connected. The line might well be merely the medium through which the exhaust steam from the digester is transmitted to the heat exchanger. If so, the line in which the imported heat exchanger is installed is probably neither a part of the digester nor of the exchanger. The pipes which carry steam from a boiler to a radiator are not necessarily a part of the boiler or of the radiator. They are at best merely a transmitting medium. The sole function of the radiator is to utilize and distribute heat furnished by the steam generated in the boiler. Similarly, the single purpose of this spiral heat exchanger is to transfer the heat supplied by the exhaust steam from the digester to the cold medium passing through the exchanger.

Nor does it appear of record that the exhaust steam thus utilized contributes in any way to the actual making of pulp. Indeed, any such claim would apply with equal force to the offensive gases and odors in such exhaust steam. Apparently it is highly desirable to eliminate such gases and odors, as evidenced by the testimony of the witness above quoted as to the use of the exchanger.

It is a matter of common knowledge of which the court may take judicial notice that many manufacturing establishments have installed therein fans or other devices to eliminate offensive odors or gases. Ordinarily, these contrivances would not be considered parts of particular machines which made given products, unless the device was incorporated in and formed an integral part of the internal mechanism of the machine proper.

Similarly, it is conceivable that there may well be in a pulp-making plant many mechanisms other than pulp-making machines or parts thereof. For example, it would not necessarily follow that dynamos, motors, steam engines, or other power-driven contrivances employed in such a plant must be regarded as pulp-making machines or parts thereof. They might be considered part of the machinery of the plant but not necessarily of the pulp-making machines proper.

In *United States* v. *J. E. Bernard & Co., Inc.,* 28 C. C. P. A. (Customs) 182, C. A. D. 142, our appellate court had before it for tariff classification two filters used in the clarification of certain liquids. The court

pointed out that, when in use, these filters worked in connection with a pump and a container-filling device; that the "pump forces the liquid out of a tank into, or through, the filter sheets that are between filter plates embraced in a frame, whence it goes to the container-filling unit." Of the complete apparatus the court said:

* * *. While the combined units may fall within the broad designation of machinery, it must be borne in mind that there is a distinction between "machinery" and "machines," and that paragraph 372, *supra*, while providing for parts of machines does not provide for parts of machinery.

As I view the record it presents a situation analogous to that which prevailed in *Testing Machines, Inc.* v. *United States*, 12 Cust. Ct. 42, C. D. 828. That case involved the dutiable status of a device described as a "Canadian Standard Freeness Tester." As in the instant case, it was assessed with duty at the rate of 45 per centum ad valorem under said paragraph 397 as an article, not specially provided for, composed in chief value of metal. It was claimed to be dutiable at 20 per centum ad valorem under the provision in the trade agreement with Sweden, incorporated in paragraph 372 of the Tariff Act of 1930, covering machines for making paper pulp or paper, and parts thereof. In that case we said:

It is not clear from the testimonial record precisely how these instruments are adjusted for use in a paper mill, the witness stating that "They are right alongside the beater machine—the beating machines, the machine that beats the pulp." However, aided by the pictorial representation (exhibit A), it would appear that the device is in two sections, each fastened, one above the other, to a panel, which in turn is apparently bolted to an upright surface. The function of the device is to determine the "beating degree of the pulp, or, in other words, how fine or how coarse the pulp is beaten. * * *

Accordingly, we there expressed the opinion that—

The evidence before us falls far short of establishing that the freeness tester "is something necessary to the completion" of a machine for making paper pulp or paper. Neither does the record prove in the slightest degree that the tester is "an integral, constituent, or component part," without which the paper pulp or paper-making machine could not function as such. The device lacks the inherent attributes outlined by our appellate court in *United States* v. *Willoughby Camera Stores, Inc.*, *supra*, and the other cases above cited, to be properly characterized as a "part" of any machine. * * *.

Counsel for the plaintiff in their brief herein contend that—

The case at Bar is directly analogous to the issue in the case of *Paper Mill Equipment, Ltd.* v. *United States*, reported in 7 Cust. Ct. Reports, page 25, C. D. 526, wherein this Court held certain wire mesh cloth a part of a pulp making machine.

Adding that—

The reasoning applied in that case should be here applicable, namely: that the imported merchandise was an integral, essential part of the pulp machine without which the machine could not perform the function for which it was designed and constructed.

After quoting at length from the testimony of three witnesses in that case, this court found that the therein involved merchandise, which consisted of wire cloth, some having 28 and some less than that number of meshes in warp and filling per lineal inch, was, in its imported condition, ready to be affixed to a Kamyr pulp-making machine without requiring any further manipulation or work applied thereto; that it was an integral part of said machine without which the latter could not function for the purpose for which it was designed and constructed, and had *no other use* than as such part.

On those facts we concluded that—

Although the present wire screen or cloth is an integral part of a pulp-making machine, nevertheless on account of its size it is not suitable for use in paper-making machines. Therefore, it must be excluded from the said provision in paragraph 318. *Geo. S. Bush & Co., Inc.* v. *United States*, T. D. 48138, 69 Treas. Dec. 251. And since it is an integral part of a pulp-making machine, without which said machine could not properly perform its function, this screen or cloth is properly dutiable under said paragraph 372, as alleged by the plaintiff. *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. 322, T. D. 46851.

Obviously the facts there and here presented readily distinguish the *Paper Mill Equipment* case, *supra*.

The majority reach the conclusion that the spiral heat exchanger in controversy is an integral, constituent, and component part of a machine for making paper pulp, without which the machine would not function, citing the rule announced in *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851.

It is true that the *Willoughby* case lays down the rule that in order for an article to be legally a "part" of another article it must be "an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*." However, that is not all. Not only must the alleged "part" be an "integral, constituent, or component part," etc., as above indicated, but it must also be *chiefly used* as a "part" of the machine to which it is to be joined.

The majority squarely disavow the latter contention. They quote several extracts from the *Willoughby* decision, one of which reads as follows:

The court below held that the involved tripods were chiefly used as parts of cameras, and, therefore, dutiable as such parts. Of course, if they are parts of cameras *and chiefly so used*, the judgment must be affirmed. *Magone* v. *Wiederer*, 159 U. S. 555. However, if they are not parts of cameras, the fact that they are chiefly used in connection with, and as supports for, cameras, is, obviously, not of vital importance in a proper determination of the issues before us. [Italics supplied.]

Commenting upon this, the majority opinion reads in part:

* * *. In other words, the last quotation from the *Willoughby* case *reads out of the equation any question as to the use or chief use of the article* which is claimed to be a part of another article. This must necessarily be true, because the rule

for determining whether or not a given article is a part of another article is without qualification, and contains no mention of use or chief use. [Italics supplied.]

I sharply disagree with the statement that the *Willoughby* quotation "reads *out of* the equation any question as to the use or chief use of the article." [Italics supplied.] In my opinion, the *Willoughby* quotation reads *into* the "equation" the question of use. Further, I am in disagreement with the statement that "the rule for determining whether or not a given article is a part of another article is *without qualification*, and contains no mention of use or chief use." [Italics supplied.]

The language quoted from the *Willoughby* case, *supra*, expressly states that "Of course, if they are parts of cameras *and chiefly so used*, the judgment must be affirmed." [Italics supplied.] In the presence of such explicit language, predicating the classification of articles upon their chief use as integral, constituent, or component parts of some other article, it is impossible to ignore consideration of chief use in "the equation."

. That the appellate court in the *Willoughby* case was impressed with the fact that chief use was a *sine qua non* to the classification of an article as a "part" of something else, is evidenced by its citation of *Magone* v. *Wiederer*, 159 U. S. 555. In that case the question before the court was whether certain pieces of glass, cut into shape to order and having beveled edges, and which were intended to be used in the manufacture of clocks, should be classified as "articles of glass, cut, engraved," etc., or as "parts of clocks." In its statement of the case the Supreme Court observed in part:

* * *. The court below, after instructing the jury that the burden was upon the plaintiff to establish by a preponderance of evidence that the articles were *parts* of clocks, *laid down the following rule by which they were to determine whether the glass was to be so considered:*

"In determining this question, whether or not these articles are parts of clocks, it will not be necessary for you to say that they were exclusively used for that purpose. An article may be chiefly used for a certain purpose and be diverted from its principal use; somebody may put it to a purpose for which it was not originally intended. That could not, in my judgment, change its tariff nomenclature. * * * And so I will say to you, as the law of the case, as I understand it, that if you find that these articles were *chiefly used* as *parts of clocks*, that would determine their tariff classification. But it is entirely clear, upon the other hand, that they must be *chiefly* and *principally* used for that purpose. If they are articles, all, or one or more, as the case may be, which have no distinguishing characteristics, which are just as applicable for use in fancy boxes or in coach lamps as they are for clocks, just as applicable to the one use as to the other, then it would be entirely proper to say that they have no distinguishing characteristics as parts of clocks. They might be used for one purpose just as well as for another. And if you find as to those articles, or any of them, that they have several uses to which they are perfectly applicable, then as to those articles your verdict should be for the defendant." [Italics supplied.]

The Supreme Court concluded its opinion by stating that the charge to the jury "was manifestly correct," and affirmed the judgment of the lower court, sustaining the claim that the articles were "parts of clocks."

I am satisfied that the *Willoughby* case clearly stands for the proposition that for an article to be legally a part of something else it must be established that it is chiefly used as an integral, constituent, or component part without which the article to which it is to be joined, could not function as such article.

In the case before the court there is undisputed testimony of the vice president and general manager of the plaintiff corporation that "this spiral heat exchanger has been applied in almost all chemical industries, principally, however, in the pulp industry and sugar industry, and by some in the sulphuric acid industry."

The mere fact that the article may be used "principally" in the pulp and sugar industries is no evidence at all of its *chief use* in either one of such industries. It is a matter of no particular consequence that the imported heat exchanger now before the court may have been used in connection with a pulp-making machine. The important question is what is the chief use of heat exchangers of this type. *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913, and *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706.

It becomes at once apparent that if the imported article were to be classified as a "part" without considering its chief use, absurd results would follow such classification. For instance, the present case illustrates how a heat exchanger might be classified at one port at the rate of 20 per centum ad valorem under paragraph 372, as amended, *supra*, as a part of a machine for making paper pulp, while the same article imported at another port might be classified free of duty as a "part" of "machinery for use in the manufacture of sugar" under paragraph 1604 of the Tariff Act of 1930. It is to avoid such anomalies that the rule of chief use as an integral, constituent, and component part, as laid down in the *Willoughby* case, should be applied. Indeed, from a grammatical viewpoint the provision for "Machines for making paper pulp or paper" is not unlike the one covering "machinery for use in the manufacture of sugar" in said paragraph 1604. In judicially enunciating the classification test applicable to the latter paragraph, our appellate court, in *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472, said:

All these considerations imply and necessitate that the use of the implement must determine its classification whether or not an agricultural implement within the paragraph, *and that that use, and the determinative fact, is chief use*. [Italics supplied.]

That rule is so well established and of such frequent reiteration by the courts that its suggestion seems sufficient. This court affirmed and applied the rule as to "smokers' articles" in Knauth v. United States (1 Ct. Cust. Appls., 334; T. D. 31432); as to "wire rods," in Athenia Steel & Wire Co. v. United States (1 Ct. Cust. Appls., 494; T. D. 31528); applied it in Drakenfeld & Co. v. United States (2 Ct. Cust. Appls., 512; T. D. 32248); adopted it as to "jute manufacturing machinery" in United States v. Hempstead & Son (3 Ct. Cust. Appls., 436;

T. D. 33004), and as to "philosophical and scientific instruments," etc., in United States *v.* Kastor & Bros. (6 Ct. Cust. Appls., 52; T. D. 35323). In fact no principle is more firmly established in customs adjudication. Magone *v.* Wiederer (159 U. S., 555); Magone *v.* Heller (150 U. S., 70); Cadwalader *v.* Wanamaker (149 U. S., 532); Walker *v.* Seeberger (149 U. S., 541); Chew Hing Lung *v.* Wise (176 U. S., 156); Meyer *v.* Cadwalader (89 Fed., 963); Smith *v.* United States (93 Fed., 194).

In my opinion, therefore, the decision of the collector of customs herein should be affirmed.